UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ANTONIO DARNELL MAYS,

        Plaintiff,

    v.                                                  Case No. 22-cv-1180-bhl

SARAH COOPER, *et al*.,

        Defendants.

---

## DECISION AND ORDER

---

Plaintiff Antonio Darnell Mays, who is representing himself, is proceeding on a First Amendment claim that Defendants implemented a mail policy at the Department of Corrections (DOC) that unconstitutionally denied him delivery of his *legal* mail after he refused to consent to allowing a third-party to screen his *non-legal* mail. Dkt. Nos. 1 & 9. The parties have filed cross-motions for summary judgment. Dkt. Nos. 17 & 21. As explained below, the Court concludes that while the undisputed facts establish that Defendants violated Mays' First Amendment rights, the record would support only nominal damages. The Court also concludes that given the lack of caselaw on this issue, Defendants are entitled to qualified immunity. Accordingly, the Court will deny Mays' motion, grant Defendants' motion on qualified immunity grounds, and dismiss the case.

## UNDISPUTED FACTS

Mays is an inmate at the Green Bay Correctional Institution (GBCI). Dkt. No. 23, ¶1. Defendants are all employed with the DOC. *Id*., ¶¶2-6. Sarah Cooper is Administrator of the DOC's Division of Adult Institutions (DAI). *Id*., ¶2. Robert Miller is the DAI's Security Chief.

*Id*., ¶3.  Wendy Monfils is Director of the DAI Office of Management and Budget (OMB).  *Id*., ¶4.  Kelly Reignier is a mailroom Sargent at GBCI.  *Id*., ¶6.

For several years prior to November 2021, the DOC had established policies and procedures for handling inmate legal and non-legal mail.  *Id*., ¶¶7-9.  With respect to incoming mail, all inmates arriving at a DOC facility were required to sign a written form, DOC-2468, by which they acknowledged the DAI's rules and regulations and specifically consented to receiving mail that was "opened, examined, [and] censored" by institution staff for security.  *Id*., ¶7; *see also* Wis. Admin. Code §DOC 309.04(2)(a).  DOC regulations provided that an inmate who refused to sign DOC-2468 would not receive mail, and any correspondence sent to the inmate would be returned to the Post Office unopened and marked "refused."  Dkt. No. 23, ¶9.  This policy was noncontroversial.  According to Defendants, it was "very rare if ever" for an inmate to refuse to sign DOC-2468 and not consent to the DOC's handling of incoming mail.  *Id*., ¶8.

In the past several years, the DOC changed its mail handling policy in response to concerns over illegal drugs finding their way into corrections facilities through inmate mail.  *Id*., ¶¶12-18.  In 2019, the DOC started noticing an influx of drug-soaked paper coming into its institutions through prisoner mail, both legal and non-legal.  *Id*., ¶12.  Some of this illicit mail appeared to be originating from law-affiliated organizations, including the Department of Justice (DOJ).  *Id*., ¶¶41 & 42.  Due to the rapidly changing composition of the illicit substances that were used to create the drug-soaked paper, the DOC could not keep up with detecting every possible substance in prisoner mail.  *Id*., ¶13.  Accordingly, the DOC explored other options to prevent contraband drugs from entering DOC facilities through the mail.  *Id*., ¶15.

In November 2021, the DOC adopted a new procedure to address this concern, but it applied only to the handling of prisoners' *non-legal* mail.  *Id*.  Under its new approach, the DOC

contracted with a third-party vendor (Text Behind) to open and process all non-legal prisoner mail offsite, at TextBehind's facility. *Id*. Under the arrangement, the vendor would scan all non-legal mail and provide the DOC institution with copies that would then be distributed to inmates. *Id*., ¶16. This eliminated any possibility that the original, drug-soaked papers would find their way into the prison. *Id*.

The contract with TextBehind applied only to *non-legal* mail. *Id*., ¶15. DOC institutions continued to handle *legal* mail consistent with prior practice. *Id*., ¶¶15 & 39. Institution staff continued to open all legal mail in the inmate's presence, without reading its contents, while inspecting it for contraband. *Id*., ¶¶15 & 39.

Between November 2021 and September 2022, DOC administrators, including Cooper, Miller, and Monfils, issued a series of memos describing the DOC's new process for screening mail. *Id*., ¶¶19-32. Among other things, the memos explained that inmates would now be required to sign a *new* electronic consent form—DOC 2468-*A*—in order to receive mail. *See id*. This was in addition to the inmate's prior signature on DOC-2468. Although the revised procedure for scanning inbound mail applied only to non-legal mail, the DOC decided that a prisoner's failure to sign the updated electronic consent form would result in that prisoner being denied receipt of *all* mail, including both non-legal and legal mail, notwithstanding that inmate's prior signing of DOC-2468. *See id*. The memos explained that a third-party vendor would be screening non-legal mail (rather than institution staff) and that the consent would be recorded electronically for record keeping purposes. *Id*., ¶¶18 & 35. Beyond this change, the mail screening process would remain the same. *Id*., ¶35. The DOC issued at least five different memos warning inmates that they would not receive *any* mail (including their legal mail) if they did not sign the new electronic consent form, allowing for the third-party vendor's screening of their non-legal mail. *Id*., ¶¶22-28.

Prior to the policy change, on February 13, 2019, Mays signed the Acknowledgement of Receipt of/ Access To/ Information form (DOC-2468), consenting to receive mail. *Id*., ¶¶7 & 40. Three years later, on March 23, 2022, staff opened a piece of what appeared to be Mays' legal mail in his presence. *Id*., ¶¶41-42. The correspondence appeared to have been sent to Mays from the Department of Justice (DOJ). *Id*. After opening the mail, institution staff noticed stains on the paper, decided to test it, and confirmed it tested positive for K-2. *Id*., ¶42. *Id*.

A few weeks later, on April 5, 2022, Mays submitted DOC 2468-A but indicated that he did not consent to the new screening policy for his non-legal mail. *Id*., ¶43. His refusal put him among a small group (less than 10% of inmates) who likewise refused to consent to having TextBehind screen their non-legal mail. *Id*., ¶44. Reignier offered Mays several opportunities to change his mind, but he refused to do so. *Id*., ¶¶45 & 46. Other inmates who initially refused to consent later changed their minds and signed the document. *Id*. Any inmates that signed the new form would continue to receive both their legal and non-legal mail. *Id*.

The new mail policy went into effect on September 13, 2022. *Id*., ¶¶30 & 47. From that point forward, correctional staff were instructed to hold back *all* mail, including legal mail, if staff verified in the Wisconsin Integrated Corrections System (WICS) that an inmate had not signed the new electronic consent form. *Id*., ¶¶32 & 50. Pursuant to that instruction, staff began withholding both Mays' legal and non-legal mail. *Id*., ¶¶51-54. On September 16, 2022, Reignier confirmed that Mays had not signed the updated electronic consent form and returned four pieces of Mays' mail to the sender. *Id*., ¶¶51 & 52. This mail was returned to: (1) the Dane County Clerk of Court, (2) the Wisconsin Court of Appeals Clerk of Court, (3) the Wisconsin Supreme Court Clerk of Court, and (4) the DOJ.[1] *Id*., ¶52. The returned mail from the Dane County Clerk of Court was a

---

[1] The Seventh Circuit has explained that mail from a Clerk's office, the Court, or the DOJ is not considered "legal mail" for purposes of constitutional rights because, unlike mail from a lawyer, mail from these sources is not of a

document Mays had erroneously sent to the wrong court; the returned mail from the Wisconsin Court of Appeals Clerk of Court was a letter indicating that he had not yet missed any deadlines in his appeal and his brief was not due until October 31, 2022; and the returned mail from the Wisconsin Supreme Court Clerk of Court was an order denying his petition for review. Dkt. No. 29 at 4. The contents of the returned mail from the DOJ are not clear. *Id*.

On September 19, 2022, Reignier confirmed that Mays had not signed the consent form and returned to the sender mail addressed to Mays from the law firm of Wasielewski & Erickson. *Id*., ¶53. The returned mail from Wasielewski & Erickson was a copy of a decision from the Wisconsin Supreme Court denying his petition for review. Dkt. No. 29 at 4-5; Dkt. No. 19 at 1-2. On September 28, 2022, Reignier confirmed that Mays had not signed the consent form and returned another piece of mail addressed to Mays from the DOJ. Dkt. No. 23, ¶54. Again, it's unclear the contents of the returned mail from the DOJ. *See* Dkt. No. 29 at 4-5. On October 11, 2022, Mays relented and signed the new electronic consent form. Dkt. No. 23, ¶55. After signing the consent, Mays' mail was no longer returned to the sender. *Id*.

About five months later, on March 3, 2023, the DOC abandoned its new policy altogether. *Id*., ¶33. Defendants explain that they conducted a review of nationwide correctional mail processing practices and decided they had never actually needed prisoners' consent to process their mail. *Id*., ¶¶33 & 34. Defendants further explain that, in addition to being unnecessary, the electronic consent tracking system through which they attempted to implement their unnecessary policy change proved unduly burdensome and was riddled with technological glitches. *Id*., ¶¶10-11, 17-18, 27, 31, 36-39, & 49. The DOC's intent was for all inmates to have a new *electronic* consent form on file, separate from the other acknowledgments on DOC- 2468, because mail

---

nature that might give the reader insights into the prisoner's legal strategy. *See Guajardo-Palma v. Martinson,* 622 F.3d 801, 806 (7th Cir. 2010); *see also Martin v. Brewer,* 830 F.3d 76, 78 (7th Cir. 1987).

consent could be revoked while the other agreements on the form were a one-time acknowledgment. *Id.*, ¶¶10,11, 17 & 18. They hoped that a separate electronic consent form would also assist in creating an external notification system, permitting TextBehind to know which inmates refused consent without receiving unnecessary access to any other DOC information. *Id.*, ¶18. But the electronic consent tracking system experienced frequent technological glitches and institutions were having difficulty creating accurate lists of who consented and who did not at each institution. *Id.*, ¶¶37, 38, & 49. Inmates who had refused consent were inaccurately marked as consented, and vice versa. *Id.*, ¶¶31, 32, & 49. Correctional staff were therefore directed to hold mail back only if they could "verify" that an inmate did not consent, which ultimately meant that correctional staff had to individually search non-consenting inmates in the database each time a mail issue arose to make sure that the inmate still had not consented. *Id.*, ¶32. There were about 90 inmates at Green Bay who refused to sign their consent forms, making this task immensely burdensome. *Id.*, ¶44. Mailroom staff at each institution were supposed to receive a daily roster of the inmates who did not consent, but the lists proved inaccurate and staff were nevertheless required to conduct individual verifications. *Id.*, ¶¶48-50.

Defendants explain that, when the new electronic consent form was created, the DOC had not anticipated that inmates would refuse to provide consent. *Id.*, ¶36. Defendants further explain that the DOC never considered the possibility of using two different consent tracking systems, one for legal and the other for non-legal mail, even after it became clear that some inmates were refusing to consent to third-party screening of non-legal mail yet still wanted to consent to screening and receiving legal mail. *Id.*, ¶37. According to the DOC, it would not have been feasible for the institutions to have different tracking systems to account for two types of mail given the extreme difficulty and delays they were already experiencing in processing just one

6

consent form. *Id.*, ¶¶38 & 39. Further, inmates frequently transferred between prisons, were admitted to prison, and/or were released from prison, so each prison's mailroom list of non-consenting inmates were constantly changing. *Id.*, ¶39. Additionally, expecting correctional officers to obtain individual consents from inmates for their legal mail each time the officer opened legal mail in the presence of the inmate, would have been untenable due to staffing shortages and disagreeable inmates. *Id.* The DOC thus contends it believed the universal consent policy was the most efficient way to attempt to retrieve updated electronic consents that the DOC believed it needed to search inmate mail for contraband while also organizing prison administration. *Id.*

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party asserting that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

7

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

**ANALYSIS**

I. **The DOC's Policy of Denying Mays Access to His Legal Mail to Coerce him to a Policy Change Affecting only his Non-Legal Mail Violated His First Amendment Rights.**

This case arises from the DOC's now-abandoned "universal consent" policy under which it would not allow inmates to receive *any* of their mail, including legal mail, unless they signed a consent authorizing a third-party's screening of their non-legal mail. The parties have filed cross-motions for summary judgment. Mays contends that he is entitled to summary judgment because it is undisputed that he was denied six pieces of mail without proper justification in September 2022. Dkt. No. 18. Defendants concede that he was denied six pieces of mail but insist they are entitled to summary judgment because the universal consent policy was constitutional and, even if it was not constitutional, they are entitled to qualified immunity. Dkt. No. 22.

According to Defendants, the universal consent policy was constitutional because it reasonably related to legitimate penological interests. They contend it streamlined and organized prison administration, allowing the DOC to acquire the consents it needed to screen prisoner mail for contraband. Defendants emphasize that both legal and non-legal mail were testing positive for illicit substances when the policy was enacted. While the procedural change only applied to non-legal mail, Defendants insist that staffing shortages and constant technological glitches made it impossible to have a separate consent procedure for non-legal mail. They argue that the old consent system had become administratively burdensome because inmates frequently moved in and out and were transferred between prisons. As a result, the lists of consenting inmates were

8

constantly changing, requiring staff to look up each non-consenting inmate to confirm non-compliance every time there was a mail issue.

### A. Defendants Have Identified a Legitimate Penological Purpose.

Defendants are correct that the First Amendment allows for prison regulations that restrict an inmate's right to send and receive mail if the regulations reasonably relate to a legitimate penological interest. *Turner v. Safley,* 482 U.S. 78, 89-90 (1987). To determine reasonableness, the Court considers whether there is a valid, rational connection between the prison's objective and the regulation; whether alternative means of exercising the right are available; whether accommodating the asserted right unduly impacts the prison's resources; and whether obvious easy alternatives exist to accommodate the prisoner's right. *Id.* This test applies irrespective of whether the policy involves legal or non-legal mail. *Lashbrook v. Hyatte*, 758 F. App'x 539, 541 (7th Cir. 2019) (citing *Shaw v. Murphy*, 532 U.S. 223, 231 (2001)).

The Seventh Circuit has long held that preventing the introduction of contraband into an institution is a legitimate penological interest. *See Turner,* 482 U.S. at 89-90. The state also has a legitimate interest in the efficient administration of the prison and "saving staff resources." *Lashbrook*, 758 F. App'x at 541 (citing *See Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007)). Defendants are thus on solid ground with respect to their goals. But their problem, and the determinative issue here, comes from the remaining *Turner* factors.

### B. Defendants Have Not Shown a Reasonable Connection Between the Policy Change and the Denial of Mays' Legal Mail.

The First Amendment demands more than just a finding that the prison had legitimate objectives in adopting the policy at issue. Under *Turner*, Defendants must also show a "rational connection" between the goal of stopping contraband and the regulation's impact on legal mail. *See Turner,* 482 U.S. at 89-90. The Court must also consider the "alternative means" left available

9

to prisoners to exercise their right to receive legal mail, the impact that accommodating prisoners' right to receive legal mail had on the prison's resources, and the alternatives to requiring the electronic consent as a condition to receiving legal mail. *Id.*

The record confirms that Defendants' policy change to require inmates to authorize TextBehind to screen non-legal mail would have been, by itself, a legitimate policy change rationally related to keeping illicit drugs out of the prison. The policy addressed the threat of contraband for non-legal mail by allowing TextBehind to provide inmates photocopies of their non-legal mail in place of the original. Any drug-soaked paper used for non-legal mail thus never entered the institution in the first place. But Defendants have not shown that requiring prisoners to sign a consent to allow the change to the screening of *non-legal* mail was legitimately related to its denial of prisoners' right to receive *legal* mail. As a matter of logic, it was not. The DOC's procedures never changed with respect to the handling of prisoners' legal mail. The DOC only changed the process for non-legal mail. The DOC then used the threat of withholding legal mail to coerce prisoners to consent to the changed process for handling their non-legal mail.

While it is unclear that the institution actually needed inmates' consent to use a vendor to screen their non-legal mail, it is clear that requiring that consent had nothing to do with the institution's handling of prisoners' legal mail. Mays had already signed DOC-2468 and consented to their handling of his mail; he simply refused to sign an updated electronic consent related to a third-party vendor handling his non-legal mail. In the end, Defendants held his legal mail hostage to get him to sign a consent that related solely to the institution's handling of his non-legal mail. Officers were not doing *anything* different to process legal mail at the institution and the electronic consent policy had nothing to do with his legal mail. Defendants offer no rationale to justify how

requiring an inmate to consent to TextBehind's screening of non-legal mail could possibly have served to prevent the entry of drugs on paper masquerading as legal mail.

As for conserving resources and easing administrative burden, while Defendants report that it was costly and time-consuming to have two different consent procedures that required personnel to look up whether an inmate had signed the updated electronic consent form, they do not explain why it mattered whether an inmate signed the updated electronic consent form.  As noted above, the updated consent form merely added an allowance for non-legal mail to be sent to TextBehind for processing; legal mail continued to be sent directly to the prison for delivery to the inmates by correctional officers.  Legal mail would be presented in person to the inmate whose consent or non-consent was received at that time, as it always was.  The additional electronic consent form had nothing to do with this process.

Defendants contend that it would have been "very difficult" to expect corrections officers to obtain individual consents from prisoner at the time they opened their legal mail in the inmate's presence.  They offer no explanation for this assertion, which seems inconsistent with the DOC's longstanding practice and this Court's experience.  Corrections officers have always solicited consent to open legal mail from inmates in person when opening the mail and have returned legal mail to the Court when consent is not given.  Given Defendants' admission that the process for legal mail did not change, there could be no difficulty in corrections officers asking – as they apparently continued to do – for the inmate's consent before opening legal mail in the inmate's presence.  Defendants similarly do not explain why correctional officers would have had to look up whether an inmate consented to TextBehind screening his non-legal mail before processing the inmate's legal mail.  The institutions already had inmates' consent to process their mail, and an inmate's refusal to *additionally* consent to TextBehind screening their non-legal mail had no

11

impact on that prior consent, a reality that was acknowledged by the DOC when it scrapped the entire effort. Any administrative value in having the same updated electronic consent form from all inmates, regardless of when or how long ago the inmate entered the institution does not justify denying legal mail to an inmate who refused to cooperate in that endeavor.

Defendants argue that a different court in this district already considered and rejected the proposition that the DOC's mail consent policy was unconstitutional. *See Stibbe v. Evers,* 2022 WL 1225299 (E.D. Wis. April 26, 2022). They quote a passage from that decision that they believe is dispositive of the issue in this case:

> "Since January 2015, the plaintiff and all other incarcerated persons in the DOC have been required to either consent to having their mail processed through the institution mail services or having incoming mail returned to the post office unopened. That choice is not new; it is only the nature of the mail service that has changed. That choice does not violate the plaintiff's constitutional rights. He can consent to having his mail processed through the institution mail service (which includes, for some kinds of mail, scanning and copying by TextBehind). If he does not consent, he will not receive mail, but that is his choice—just as it has been since 2015."

*Id*. at *9.

This passage in *Stibbe* related to a challenge to the DOC's requirement that inmates consent to receive their non-legal mail, following the policy change under which non-legal mail was being screened by TextBehind. *Stibbe* did not address the "universal" portion of the mail consent policy, *i.e.*, the constitutionality of the DOC's decision to hold a prisoner's *legal* mail hostage to get him or her to sign a consent that related solely to the institution's handling of prisoner's non-legal mail. To the contrary, the Court in *Stibbe* presumed that the procedures to process legal and non-legal mail were totally separate and unrelated, noting that "nothing about the DOC's decision to contract with TextBehind changes the requirements of 309.04(3) or the Supreme Court and Seventh Circuit law discussed above" in connection with legal mail. *Id*. Toward that end, the Court in *Stibbe*

12

noted that, if staff have handled an inmate's legal mail in a way that has prevented him from pursuing his legal rights, he could bring that claim to the Federal court. *Id*. And that is exactly what Mays has done by filing this case. In short, the *Stibbe* decision did not address the Universal Consent policy at issue in this case; and the record in this case confirms that Mays was improperly (albeit briefly) denied his legal mail in September 2022 pursuant to a policy that did not pass constitutional muster.

### C. Mays Has Not Offered Any Proof of Actual Damages and His Request for Injunctive Relief is Moot.

While the record confirms Mays' constitutional violation, it also confirms that his remedies are limited. In terms of compensatory damages, Mays does not contend he suffered any financial or other harm from the violations. And the nature of the violations – denial of access to legal mail for a short period – logically precludes any damages for physical injury. Emotional distress damages are unavailable too. While Mays may have been upset about the denial of his mail, the Prison Litigation Reform Act precludes Mays from recovering compensatory damages for any mental and emotional distress because he suffered no physical injury. *See* 42 USC 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act."); *see Minneci v. Pollard*, 565 U.S. 118, 129 (2012) ("Prisoners bringing federal lawsuits, for example, ordinarily may not seek damages for mental or emotional injury unconnected with physical injury."). This leaves him with at most nominal damages.

Mays claims punitive damages, but the undisputed facts simply do not support such an award. S*ee Smith v. Wade*, 461 U.S. 30, 56 (1983) (noting that punitive damages require proof that the defendant was "motivated by evil motive or intent" or "reckless or callous indifference to

a plaintiff's constitutional rights."). Although the DOC's plan ultimately was ill-conceived and too burdensome to execute, there is no evidence that it was "motivated by evil motive or intent" or was "reckless or callous indifference to a plaintiff's constitutional rights."

Mays' request for injunctive relief also fails. As of March 2023, the DOC no longer requires any type of consent to receive mail because it was far too burdensome to enforce. For that reason, it is unlikely that the universal consent policy will be reinstated in the future. Defendants are therefore correct that Mays' request for injunctive relief is moot. *See Ciarpaglini v. Norwood*, 817 F.3d 541, 545 (7th Cir. 2016) ("A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.").

Accordingly, if the Court were to award Mays any remedy, it would be $1 in nominal damages. But, as discussed below, Mays is not entitled even to this limited remedy because the Court concludes that Defendants are entitled to qualified immunity.

## II. Defendants Are Entitled to Qualified Immunity.

Qualified immunity protects government officials from facing suits for damages when their actions do not violate clearly established constitutional or statutory rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants assert qualified immunity as an affirmative defense. Dkt. No. 22 at 22-25. Once Defendants assert this defense, Mays has the burden to establish that Defendants' action violated a clearly established right. *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010). To be clearly established, a right "must be sufficiently clear 'that every reasonable official would have understood that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012). This is a high bar. *Kramer v. Pollard*, 497 F. App'x 639, 642 (7th Cir. 2012). To defeat a qualified-immunity defense, Mays must point to a case that, even

14

Case 2:22-cv-01180-BHL | Filed 09/05/24 | Page 14 of 16 | Document 33

if not factually identical, places "the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011).

Defendants assert that they are entitled to qualified immunity because neither the Seventh Circuit nor any other district court in this circuit have held that inmates have a constitutional right to piecemeal consent broken down by mail category. Dkt. No. 22 at 22-25. But Defendants do not correctly frame the issue before the Court. The issue is whether Defendants were entitled to withhold *legal* mail based solely on an inmate's refusal to sign an updated consent form that effected a change only to the process for screening non-legal mail. Defendants assert that they followed what they believed were the consent requirements of Wis. Stat. §DOC 309.04(2)(a), which states that incoming mail can be opened, examined, and delivered "*only* if the inmate consents in writing to receive mail through institutional services." (emphasis added). This provision further states that if an inmate does not consent to receive mail through institutional services, the institution shall return incoming mail unopened and marked refused. §DOC 309.04(2)(b). That is precisely what the institution did with Mays' legal mail. Defendants also point to the only one other case (*Stibbe*) that is related to the consent policy at issue in this case, and while that case did not address the "universal" aspect of the DOC's mail consent policy, they contend it shows the policy was at least arguably justified.

May did not respond to the qualified immunity argument or otherwise point to a case showing that his clearly established rights were violated by Defendants' attempts to comply with §DOC 309.04 by requiring inmates to sign an updated consent to address changes in the handling of non-legal mail. *See* Dkt. Nos. 29 & 32. Given lack of caselaw on this new issue, along with Mays' failure to address the qualified immunity issue at all, the Court concludes Defendants are

entitled to qualified immunity and will grant their motion for summary judgment and dismiss this case.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 17) is **DENIED**; Defendants' motion for summary judgment (Dkt. No. 21) is **GRANTED**; and this case is **DISMISSED**. The Clerk's office shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin on September 5, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

---

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

16

Case 2:22-cv-01180-BHL   Filed 09/05/24   Page 16 of 16   Document 33